UNITED STATES of America, Appellee,

v.

Marvin BLOOM and Vincent Anthony Daley, Defendants.

Appeal of Vincent Anthony DALEY, Defendant–Appellant.

No. 338, Docket 88–1186.

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 1988.

Decided Jan. 10, 1989.

George V. O'Haire, Hicksville, N.Y., for defendant-appellant Vincent Anthony Daley.

Peter E. Ball, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Emily Berger, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before WINTER and MINER, Circuit Judges, and MUNSON, District Judge.*

WINTER, Circuit Judge:

Appellant Vincent Daley appeals from his conviction on one count of conspiracy to transport, in violation of 18 U.S.C. §§ 371, 2314 (1982), and one count of transporting, in violation of 18 U.S.C. §§ 2314, 2 (1982), in interstate commerce securities known to have been converted. Daley challenged both the indictment and superseding indictment on the grounds that they violated the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1982), and the Sixth Amendment's speedy trial guarantee. These challenges were rejected by the district court. Because Daley was never subjected to a pre-indictment "arrest" for purposes of the Speedy Trial Act and the Sixth Amendment, we affirm the denial of Daley's motions. Daley also claims that the district court should have charged the jury on the voluntariness of his post-arrest statements. Daley, however, expressly waived his right to such a charge.

## BACKGROUND

In November 1983, Bernard and Stanley Myer purchased $500,000 worth of bearer bonds. Bearer bonds are payable, not to a named person, but to whatever person possesses them at their date of maturity. Bearer bonds contain coupons which may be presented seriatim on specified dates to banks for the payment of interest. The coupons will be honored regardless of who presents them. Approximately forty of the bonds at issue in this case, possessing an aggregate face value of $200,000, were delivered to the Myers's liquor store where they were placed in a small office. In January 1984, Stanley Myer discovered that the bonds were missing, and the Myers concluded that Bernard had mistakenly thrown them out with the trash. Stanley subsequently informed his broker of the disappearance of the bonds.

The bonds eventually fell into the possession of Marvin Bloom and appellant Daley. On July 25, 1984, Bloom redeemed $8,000 worth of coupons at Crossland Savings Bank ("Crossland") in Brooklyn, New York. Bloom received the $8,000 in two $4,000 checks, one made out to himself and the other to Christine Daley, appellant's wife and Bloom's daughter. When Crossland presented the coupons to the issuer of the bonds for reimbursement, the issuer informed Crossland that the coupons had come from bonds that had been reported lost. Peter Cunningham, Crossland's Director of Security, then contacted Bloom and requested that he return the $8,000. Bloom ignored this request. Bloom also redeemed coupons from the bonds at Manufacturers Hanover Bank in Manhattan. In September or October of 1984, Cornelius O'Reilly, an investigator for Manufacturers Hanover, contacted Bloom and told him that the bonds corresponding to the coupons cashed by Bloom at Manufacturers Hanover had been reported either lost or stolen. Bloom similarly did not return the money obtained from Manufacturers Hanover.

Aware that the bonds were lost and that redemption of their coupons would become increasingly difficult, Bloom decided to sell them. Bloom sent two samples of the bonds to his brother, Bobby Bloom, in Las Vegas, and directed him to arrange a sale. A "cooperating citizen" obtained the bonds and delivered them to the Las Vegas office of the FBI.

FBI Special Agent Rick Baken then contacted Bloom. Posing as an unscrupulous businessman, Baken placed a tape-recorded

---

* The Hon. Howard G. Munson, United States District Judge for the Northern District of New York, sitting by designation.

telephone call to Bloom and claimed to be interested in purchasing illegally-obtained bonds. Bloom spoke with Baken briefly and then handed the telephone to Vincent Daley whom Bloom identified as "my partner." During the ensuing conversation Daley told Baken that the bonds were "not so hot and ... not so cold" and that "they're not stolen or anything, as far as I know[,] [t]hey're just lost." After several subsequent conversations Baken, Bloom and Daley agreed that Daley would travel with the bonds to San Diego, meet Baken at the San Diego Hilton, and sell Baken the bonds for thirty cents on the dollar.

On April 4, 1985, Daley flew with his wife and the bonds to San Diego. When Daley arrived at the Hilton to consummate the sale, he was arrested by the FBI. Daley was advised of his constitutional rights and fingerprinted and photographed. Daley agreed to cooperate with the FBI and signed a written waiver of his rights. During the interrogation that followed, Daley admitted that: (i) he was Marvin Bloom's son-in-law; (ii) Bloom had given him the bonds eight or nine months earlier; (iii) Bloom had obtained the bonds from two other people; and (iv) when Bloom initially showed him the bonds, a receipt with the name Bernard Myer and the address of a liquor store was attached to them. According to Daley, the interrogation lasted for six hours and was followed by a brief stay in the Metropolitan Correctional Center in San Diego. Later on that evening, Daley was released from custody without being subjected to any formal charges. He was taken to the airport where his tickets were changed to a flight returning to New York on the morning of April 9, 1985. The FBI gave Daley $500 for expenses, and instructed him not to discuss the investigation with anyone.

The day after the arrest, the FBI filed a complaint against, and obtained federal arrest warrants for, both Daley and Bloom. The complaint charged Daley and Bloom with conspiring to transport and transporting, in interstate commerce securities known to have been converted. Because these warrants were to be used only to ensure Daley's cooperation, the FBI's New York office was instructed to execute the warrants at its discretion. Neither Daley nor Bloom was ever arrested on those warrants. When Daley returned to New York on April 9, 1985, he and his wife were greeted by four FBI agents and Daley's father, Harry Daley. After permitting Vincent to talk privately with his father for five minutes, the agents took Vincent Daley into custody and interrogated both him and Bloom for approximately thirteen hours. Daley and Bloom were thereafter released.

Daley's attorney, Thomas Lilly, contacted Assistant United States Attorney Gay Hugo in San Diego. Hugo explained that the case was under investigation and that she expected an indictment to be issued shortly. Lilly called Hugo again on May 1, 1985. She informed Lilly that the investigation had been delayed because the FBI agent directing it had been involved in an automobile accident and was temporarily unable to return to work. Hugo did state, however, that she expected an indictment.

On February 10, 1987, a federal grand jury in the Eastern District of New York issued an indictment against Daley and Bloom on the charges enumerated in the complaint filed by the United States Attorney in San Diego in 1985. That indictment was subsequently superseded on June 16, 1987 by the indictment on which Daley was ultimately tried and which contained the same charges as the 1985 complaint. Daley moved to dismiss that indictment pursuant to the Speedy Trial Act, and the Fifth and Sixth Amendments, on the ground that the government had failed to provide him with a speedy trial. After a hearing, Judge Bramwell denied Daley's motion.

Daley's first trial ended in a hung jury. At his second trial, Daley testified that he was coerced to sign the waiver statement in San Diego in 1985. Request Number Nine of Daley's written requests for jury instructions included the following:

Evidence relating to any statement, or act or omission, claimed to have been made or done by a defendant outside of court, and after a crime has been com-

mitted, should always be considered with caution and weighed with great care; and all such evidence should be disregarded entirely, unless the evidence in the case convinces the jury beyond a reasonable doubt that the statement or act or omission was knowingly made or done.

The court's charge to the jury failed to include Daley's Request Number Nine. After the trial judge completed reading the charge to the jury, Daley offered a supplemental instruction similar to Request Number Nine. The court also rejected it. Approximately one-half hour later the government forwarded a proposed supplemental instruction on the issue. That proposal read as follows:

The government has presented evidence that the defendant voluntarily waived his right to remain silent both in writing and orally prior to questioning by law enforcement officers. The defendant has contended that such waivers were not voluntarily made. It is up to you to determine whether the statements here were voluntarily made, and you should give the statements such weight as you feel they deserve under all the circumstances.

Daley objected to this charge on two grounds: (i) the language was incorrect; and (ii) the jury had been deliberating for thirty to forty-five minutes and disturbing them would prejudice his case. Consequently, no supplemental charge was given to the jury that day.

Prior to the resumption of deliberations the government offered an alternative supplemental instruction. This instruction came from Sand, Siffert, Loughlin & Reiss, *Modern Federal Jury Instructions* ¶ 5.07 (1987), and stated:

There has been evidence that the defendant made certain statements in which the government claims he admitted certain facts charged in the indictment.

In deciding what weight to give the defendant's statements, you should first examine with great care whether each statement was made and whether, in fact, it was voluntarily and under-

standingly made. I instruct you that you are to give the statements such weight as you feel they deserve in light of all the evidence.

Daley objected to this proposal as well, and consequently the court declined to read it to the jury. The jury later convicted Daley on all charges. Following trial, the case was reassigned to Judge Sifton. Daley renewed his speedy trial motion and Judge Sifton denied it.

## DISCUSSION

Daley raises three issues on appeal: (i) whether the district court erred by failing to dismiss the indictment of Daley as a violation of the Speedy Trial Act; (ii) whether the district court erred by failing to dismiss the indictment of Daley as a violation of the Sixth Amendment; and (iii) whether the district court erred in failing to give an instruction concerning Daley's waiver of his rights and the weight to be accorded to his statements made thereafter. We will address these issues seriatim.

Daley's Speedy Trial Act claim rests on Section 3161(b), which states in pertinent part that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." Daley argues that this provision was violated when he was indicted twenty-two months after having been arrested in San Diego. Section 3162(a)(1), the provision governing sanctions for violations of Section 3161, however, states in pertinent part:

[i]f, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) ..., such charge against that individual contained in such complaint shall be dismissed or otherwise dropped.

Daley argues that Section 3161(b) triggers the clock governing indictments as of the date of the first arrest. Giving Section 3161(b) that meaning, however,

would disable it from meshing with Section 3162(a)(1), which provides sanctions for a late indictment but triggers the clock as of the issuance of a complaint. Other courts faced with the problem of construing these provisions harmoniously have "uniformly [held] that an individual is not arrested under 3161(b) until he is taken into custody after a federal arrest for the purpose of responding to a federal charge." *United States v. Johnson*, 815 F.2d 309, 312 (5th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). In the present case, Daley was released from custody on the same day that he was arrested, after having been interrogated by, and having agreed to cooperate with, the FBI. We agree with those other courts that "[w]hen an individual is promptly released from federal custody without the Government filing formal charges, there is no 'arrest' within the meaning of 3161(b)." *Id.; see also United States v. Redmond*, 803 F.2d 438, 440 n. 7 (9th Cir.1986), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1963, 95 L.Ed.2d 534 (1987); *United States v. Amuny*, 767 F.2d 1113, 1120 (5th Cir.1985); *United States v. Janik*, 723 F.2d 537, 542 (7th Cir.1983).

Although the legislative history contains no explicit discussion of the issue, we agree that Congress did not intend every arrest in the course of ongoing criminal activity to force the government either to indict within thirty days or forfeit the right to prosecute. Such a rule would have called for a major revamping of existing practice and would have likely, if intended, been the subject of considerable legislative discussion. Moreover, we note that neither the government nor defendants would benefit from a rule that might create incentives to prosecute cases that would otherwise be dropped or from a rule that would compel an indictment before the value of their cooperation was apparent. Finally, our construction does little violence to the language of Section 3161(b), which can be easily read to state that the triggering "arrest" must be "in connection with such charges." An arrest that is not for purposes of answering to criminal charges thus does not begin the thirty-day period, and Daley's arrest in San Diego in April 1985 did not constitute an arrest for the purpose of starting the Speedy Trial Act clock.

■ The issue remains, however, as to whether the complaint filed on April 5, 1985, the day after Daley was released, started the Speedy Trial Act's clock. The Fifth Circuit recently addressed this issue in *United States v. Johnson*, 815 F.2d 309. In *Johnson* the defendant was arrested by Secret Service, working in conjunction with the local police, in Spring Valley, Texas on the basis of a California state arrest warrant. The arrest occurred on November 27, 1984. Subsequent to the arrest, the Secret Service agents took Johnson into federal custody, searched him, questioned him, and inventoried his car. The search of the defendant and his car produced incriminating evidence. Less than twenty-four hours later, the Secret Service brought Johnson before a state judge. The defendant waived extradition and was returned to California where he remained in state custody until March 15, 1985, when he was released on bail pending a state trial. Meanwhile, on December 11, 1984, the government had filed a complaint charging the defendant with unauthorized possession of altered credit cards and cardholder information. Later that same day a federal magistrate issued an arrest warrant on the basis of that complaint. Following the defendant's release on March 15, he was returned to Texas pursuant to a federal detainer to face federal charges. Finally, on April 3, 1985, 127 days after the defendant's arrest and 113 days after the filing of the federal complaint against the defendant, the defendant was indicted by a federal grand jury.

The defendant in *Johnson* claimed that the timing of the indictment violated Section 3161(b) because it was issued more than thirty days after the filing of the government's complaint. The Fifth Circuit rejected the argument, stating:

Section 3161(b) requires that an indictment be filed within thirty days of arrest. Unlike an arrest, the filing of a complaint does not in itself impose a significant restraint on an accused's liberty.

The complaint is merely a document on which action may or may not be taken. An accused may never even receive notice that a complaint has been filed. The filing of a federal complaint does not, *in the absence of a federal arrest in connection with that complaint,* trigger the time requirement of 3161(b).

815 F.2d at 312 (emphasis added).

In addition, in *United States v. Shahryar,* 719 F.2d 1522 (11th Cir.1983) (per curiam), the Eleventh Circuit rejected a claim "that the lodging of [a] federal complaint as a detainer with the state authorities and the setting of [a] bond by the federal magistrate on [the same day], constituted an 'arrest' within the meaning of the [Speedy Trial] Act...." 719 F.2d at 1524. The rationale of *Shahryar* is that the mere filing of a complaint was insufficient to trigger the Speedy Trial Act's timing provisions. Instead, there must be a federal deprivation of liberty in connection with that complaint. Reasoning that there was no deprivation of liberty by the federal government until the defendant was turned over to federal authorities by state authorities, the court concluded that the Speedy Trial Act had not been violated. *Id.* at 1524–25.

We agree with these decisions and hold that the filing of a federal complaint without concurrent action depriving a defendant of liberty for the purpose of facing charges is insufficient to trigger the Speedy Trial Act's timing provisions. The government's restrictions on Daley's actions between April 4 and April 9, 1985 do not constitute such a deprivation of liberty because he was "promptly released from federal custody without the Government filing formal charges...." *United States v. Johnson,* 815 F.2d at 312. Daley argues that delaying his return to New York from San Diego, the limits on his communications concerning the investigation, and interrogation upon his return to New York are a legally sufficient deprivation of his liberty. Each of these restrictions deprived Daley of some degree of liberty. Because they were not in connection with the filing of the complaint or for purposes of Daley's facing federal charges, however, they did not constitute the type of imposition that triggers the Speedy Trial Act's timing provisions. At the time Daley was subjected to these restrictions he was claiming to be voluntarily cooperating with the government's investigation. Under such circumstances, the precautions taken by the government solely to protect its ongoing investigation do not constitute a deprivation of liberty for purposes of the Speedy Trial Act.

■ The fact that there has been no violation of the Speedy Trial Act, however, does not preclude a finding that Daley was denied his Sixth Amendment right to a speedy trial. Indeed, 18 U.S.C. § 3173 states that: "[n]o provision of [the Speedy Trial Act] shall be interpreted as a bar to any claim of denial of speedy trial as required by amendment VI of the Constitution." However, in *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court stated:

it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.

404 U.S. at 320, 92 S.Ct. at 463. The Court thus "declin[ed]" to extend the reach of the amendment to the period prior to arrest." *Id.* at 321, 92 S.Ct. at 463.

As with Daley's Speedy Trial Act claim, the key Sixth Amendment issue is whether Daley was either arrested or subjected to substantial restrictions for purposes of answering a criminal charge. We believe he was not, for the reasons stated above. The restrictions imposed after his prompt release were intended only to protect an ongoing investigation and did not trigger Sixth Amendment rights.

■ The final issue concerns the failure to give an instruction to the jury concerning Daley's challenged waiver and the weight to be accorded statements Daley made thereafter. Under 18 U.S.C. § 3501 (1982), a defendant is entitled to an instruction that the "jury [should] give such weight to the confession as the jury feels it

deserves under all the circumstances." 18 U.S.C. § 3501(a). Appellant was thus entitled to an appropriate instruction on the issue. However, defense counsel did not offer the district court a proper instruction and thereafter objected to the court giving a correct charge. In *United States v. Barry*, 518 F.2d 342 (2d Cir.1975), we expressly held that "[n]either § 3501 nor the constitution mandates that a jury must disregard a confession if it believes the confession was coerced...." *Barry*, 518 F.2d at 346 (emphasis omitted). Daley's Request Number Nine and supplemental request stated that the jury should disregard Daley's post-waiver statements if they found Daley's waiver to be involuntary. The district court correctly declined to give such an instruction.

 The jury could have been properly instructed thirty minutes later when the government submitted a proposed charge that conformed with both Section 3501 and *Barry*. Although the jury had already commenced deliberations, it would not have been unduly disturbed by a supplemental instruction. *See United States v. Lewis*, 362 F.2d 759, 762 (2d Cir.1966) (corrective supplemental instruction given in response to inquiry from jury). Daley's counsel, however, refused to allow this instruction to be presented to the jury. The government then made a further attempt to offer a proper instruction on the issue. Each time it was opposed by Daley's counsel. The successful objections to the government's proposed charges thus waived Daley's right to have the jury instructed on the weight to be given to his post-arrest statements.

AFFIRMED.