**UNITED STATES of America,**

v.

**Arnold DiGREGORIO and Gregory Segnit, Defendants.**

**No. 91 Cr. 0823 (RWS).**

United States District Court, S.D. New York.

May 28, 1992.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for U.S.; Steven M. Cohen, Asst. U.S. Atty., of counsel.

George L. Santangelo, New York City, for defendant Arnold DiGregorio.

Edward S. Panzer, New York City, for defendant Gregory Segnit.

## OPINION

SWEET, District Judge.

Defendants Arnold DiGregorio ("DiGregorio") and Gregory Segnit ("Segnit") (together, the "Defendants") have moved for an order pursuant to the Fourth, Fifth and Sixth Amendments, 18 U.S.C. §§ 3161 and 3162 and Fed.R.Cr.P. 5(a) ("Rule 5(a)") dismissing the indictment against them with prejudice.[1] For the following reasons, the motion is denied with respect to the Rule 5(a) and constitutional claims. Resolution of those portions of the motion alleging prosecutorial misconduct and violation of the Speedy Trial Act is deferred pending an evidentiary hearing.

*Background*

Unless otherwise indicated, the following facts are undisputed.[2]

Some time between twelve noon and 2:00 p.m. on February 27, 1991, DiGregorio arrived at the Vista Hotel in New York City (the "Vista"). He was met by individuals who pointed guns at his head and ordered him to go with them. He did not resist and was taken to the United States Customs House at the World Trade Center. Upon arriving there, he was informed that these individuals were Special Agents James Willman ("Agent Willman") and Thomas McCormick ("Agent McCormick") of the United States Secret Service (the "Secret Service") and Special Agent Robert Ward ("Agent Ward") of the Federal Bureau of Investigation (the "FBI").

DiGregorio was subjected to a strip and body cavity search. According to DiGregorio, he was not, at any time, informed of his rights.[3] Agents Willman and Ward then informed DiGregorio that he "faced federal felony charges" and explained to him the "benefits of cooperating" with them. Government's Memo. at 4. The

---

1. The Defendants also moved pursuant to F.R.E. 104 and 18 U.S.C. § 3501 to suppress all statements made subsequent to their arrests on February 27, 1991; for an order granting a severance of their trials pursuant to Fed.R.Cr.P. 15 on the grounds that introduction of certain statements by their respective co-defendant would violate the principles enunciated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); and for an order granting them further discovery and a bill of particulars with respect to matters relevant to Counts 2 through 6 of the Indictment. The Government has represented (1) that it will not seek to introduce at trial statements obtained from the Defendants subsequent to their arrests on February 27, 1991; (2) that it will not seek to introduce post-arrest statements in which the Defen-
dants implicated one another in criminal activity; and (3) that it does not intend to pursue the charges contained in Counts 2 through 6 of the Indictment and that it does not object to the discovery request at issue. In view of these representations, it is necessary to address only that portion of the motion seeking dismissal of the Indictment.

2. The Government has conceded the Defendants' version of the facts for purposes of this motion only.

3. According to the Government, Agent Willman informed DiGregorio of his rights and DiGregorio acknowledged that he understood those rights.

agents proceeded to question DiGregorio about stolen bearer bonds.

DiGregorio denied any knowledge of or involvement with any such bonds. The agents repeated their advice about cooperation, informing DiGregorio that if he "helped the government against Mr. Segnit," nothing would happen to him.[4]

Among the personal possessions taken from DiGregorio upon his arrest was valium, which had been prescribed for him because he suffers from claustrophobia. Although he informed the agents of his condition, they refused him access to his medication until he cooperated.

After some hours of interrogation by several agents, DiGregorio agreed to cooperate. He continued to deny knowledge of any stolen bonds, but agreed to place a recorded telephone call to Segnit and to arrange a meeting with Segnit regarding the stolen bonds.

As a result of the telephone calls, Segnit agreed to meet DiGregorio in Queens that evening. Several agents transported DiGregorio to the appointed location, but Segnit failed to appear. DiGregorio again contacted Segnit by telephone. Segnit agreed to meet DiGregorio at a diner in Peekskill, New York.

DiGregorio then drove with the agents to Peekskill. At approximately 8:00 p.m., Segnit pulled into the diner in a car driven by his son, Robert. According to Segnit, the car was stopped by twelve men, with guns trained, who identified themselves as agents of the FBI. The Government maintains that Agent McCormick read Segnit his *Miranda* rights, although Segnit cannot recall whether such rights indeed were administered.

DiGregorio, Segnit and Robert were then brought to a nearby New York State Police barracks. Inside the barracks, Agents Willman, Ward and McCormick began interviewing Segnit. Segnit claims that he asked to be allowed to call his father, who would make arrangements for getting a lawyer.[5] According to Segnit, the agents refused his request and informed him that if he cooperated he would not need a lawyer. He claims that he was told that if he failed to cooperate, he would be charged and that his son would be charged as an accessory.[6] The agents informed Segnit that "he faced federal charges based on his participation in a scheme to transfer stolen U.S. Treasury Bonds" and "explained to him that any cooperation would be brought to the attention of the United States Attorneys Office." Government Memo. at 6.

According to Segnit, the agents represented that they would release him and his son if he cooperated and acted as a confidential informant for them, that he would not need an attorney and that he "could remain out of trouble" by cooperating with them.[7] Segnit repeatedly denied knowing that a certain bond was stolen. During this time, DiGregorio was also being questioned. After being informed that they would be released if they signed statements prepared by the agents, DiGregorio and Segnit signed the statements at approximately 3:00 a.m. The Defendants also orally agreed to waive arraignment.[8]

The Defendants were taken from the police barracks to the MCC in New York City, where they arrived at approximately 4:00 a.m. According to Segnit, the agents advised him that he would be released if he agreed to be wired the next day and engage in a conversation with Frank Bitetto ("Bitetto"), later named as a co-conspirator. Both DiGregorio and Segnit attest that when they inquired as to obtaining an at-

---

**4.** The Government disputes the contention that the agents represented to either DiGregorio or Segnit that any cooperation would result in immunity from prosecution. Government Memo. at 9 n. 7.

**5.** The Government denies the allegation that the Defendants expressed a desire to speak with an attorney or that the agents told them that they could not contact counsel.

**6.** The Government denies that the agents made any threats to file criminal charges against Robert.

**7.** *But see* note 4 *supra.*

**8.** The Government concedes that any waivers of arraignment were involuntary. Government Memo at 10 n. 8.

torney, the agents refused their requests and assured them that they did not need attorneys because nothing would happen to them if they continued cooperating.[9]

After spending the rest of the night in the MCC, on the morning of February 28, 1990, DiGregorio and Segnit were taken to the Secret Service office at the World Trade Center. Several agents spoke briefly with Segnit. Pursuant to the agents' requests, Segnit placed telephone calls to an Anthony Dagnone ("Dagnone") and Bitetto and agreed to meet Bitetto later that afternoon. Segnit claims that, during this time, the agents informed him that he would be expected to plead to a felony, but that he would be released without jail time on the condition that he continue to assist in their operations.[10]

Segnit was transported by federal agents to meet Bitetto. Following the unsuccessful meeting, the agents returned Segnit to the World Trade Center. Segnit was asked to sign another statement as well as a written "waiver of arraignment."[11] He was again advised that he did not need an attorney. Segnit signed these documents.

After agreeing to maintain daily contact with the agents, which he was informed was a condition of his release, Segnit was released at approximately 11:30 p.m. on February 28, 1991. According to Segnit, another condition of his continued release was that he not contact an attorney or talk to anyone about his role in the investigation.[12]

Meanwhile, during the afternoon of February 28, 1991, DiGregorio was transported to White Plains to meet with a Ricky Simpson. The meeting was aborted, and DiGregorio was returned to the World Trade Center where he was told that he would be released if he signed a written "waiver of arraignment" and another statement prepared by the agents. He signed these documents and was released at 8:30 p.m. on February 28, 1991.

Over the next several months, both Defendants stayed in contact with the agents on a daily basis, and on May 23, 1991, Segnit met with several agents at the World Trade Center, at which time he signed another statement. In mid-July, 1991, Assistant United States Attorney Steven Witzel provided counsel for the Defendants with proposed plea agreements. On or about July 23, 1991, the Defendants appeared before the Honorable John F. Keenan and informed him that they would not enter into these agreements, nor would they waive indictment. On or about October 8, 1991, the grand jury returned a six-count indictment against them.

The Defendants filed the present motion on January 27, 1992. Due to a series of postponements at the request of the parties, oral argument was heard on April 20, 1992. The motion was considered fully submitted as of April 29, 1992.

*Discussion*

The Defendants assert four alternative grounds for dismissing the Indictment. First, they contend that dismissal of the Indictment is warranted because the Government violated Fed.R.Crim.P. 5(a) by failing to present them before a magistrate following their arrests. Second, they urge dismissal of the Indictment on the grounds that their due process rights under the Fifth Amendment were violated by the "outrageous conduct" of the Government's agents. Third, they argue that the delay of over seven months between their arrests and the filing of the Indictment violates the Speedy Trial Act, 18 U.S.C. § 3161(b), thus mandating dismissal of the Indictment pursuant to 18 U.S.C. § 3162(a)(1). Finally, they maintain that the Indictment should be dismissed on the grounds of prosecutorial misconduct.

As discussed below, the facts as described by the Defendants do not support dismissal of the Indictment on the first two asserted grounds. However, because these facts, if true, may support dismissal of the

---

**9.** *But see* note 5 *supra.*

**10.** *But see* note 4 *supra.*

**11.** *See* note 8 *supra.*

**12.** *But see* note 5 *supra.*

Indictment against the Defendants for violation of the Speedy Trial Act and for prosecutorial misconduct, an evidentiary hearing shall be held as to facts relevant to these claims within thirty days of the filing of this opinion.

*Fed.R.Crim.P. 5(a)*

Rule 5(a) of the Federal Rules of Criminal Procedure provides that:

> An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take then arrested person without unnecessary delay before the nearest available federal magistrate or, in the event that a federal magistrate is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041.

█ It is undisputed that the Defendants were not brought before a judicial officer of any kind prior to their appearance before Judge Keenan in July 1991, approximately five months after the arrests. In fact, the Government concedes that it violated Rule 5(a). The Government properly maintains, however, that the appropriate remedy for a violation of Rule 5(a) is suppression of any prejudicial statements made during the period of pre-arraignment delay. *See United States v. Perez*, 733 F.2d 1026, 1029, 1035 (2d Cir.1984) (Rule 5(a) violated where there has been unnecessary and unreasonable delay in excess of six hours); *see also Mallory v. United States*, 354 U.S. 449, 452–53, 77 S.Ct. 1356, 1358–59, 1 L.Ed.2d 1479 (1957); *McNabb v. United States*, 318 U.S. 332, 343–44, 63 S.Ct. 608, 614–15, 87 L.Ed. 819 (1943); *United States v. Rubio*, 709 F.2d 146, 153–

54 (2d Cir.1983); *United States v. Egan*, 501 F.Supp. 1252, 1263 (S.D.N.Y.1980) (Sweet, J.) (imposing sanction of suppression for unnecessary delay in appearance before magistrate; dismissal of indictment not warranted unless delay rises to level of outrageous conduct that shocks the conscience).

In view of this overwhelming authority, the motion to dismiss the Indictment on the grounds of the Rule 5(a) violation is denied. The Government has represented that it will not seek to use any statements made by the Defendants subsequent to their arrests, thus obviating the need to order any evidence suppressed.[13]

*Outrageous Government Conduct*

█ The Defendants also argue that the Indictment should be dismissed because the Government's "outrageous conduct" violated their due process rights under the Fifth Amendment. The Supreme Court validated the existence of such a defense to criminal prosecution in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), writing that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1642–43. To warrant dismissal of an indictment, the outrageousness of such conduct must rise to the level of "violating that 'fundamental fairness' shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." *Id.* at 432, 93 S.Ct. at 1643 (quoting *Kinsella v.*

---

**13.** The Defendants' cite one case from the Northern District of California in support of the proposition that dismissal of the indictment is a proper sanction for violation of Rule 5(a). *See United States v. Osunde*, 638 F.Supp. 171 (N.D.Cal.1986). In that case, the defendant was held in continuous federal custody for 106 days prior to being brought before a magistrate for arraignment and for 118 days prior to being indicted. *Id.* at 173. The court dismissed the indictment on alternative grounds. First, the court found that § 3161(b) had been violated by his 118-day detention prior to the filing of an indictment. *Id.* at 174–75. The court then concluded that the violation of Rule 5(a) provided

grounds for dismissal. The court recognized that "[t]he prevalent application of Rule 5(a) is for the suppression of confessions or statements made by arrested individuals who were not brought before a magistrate in a timely fashion," and candidly admitted that it had discovered no case in which Rule 5(a) is regarded "as a substantive right rather than a procedural tool." *Id.* at 176. Nevertheless, the court proceeded to conclude, on sparse reasoning, that the 106-delay presented just the sort of "flagrant unnecessary delay" that warranted dismissal.

Finding *Osunde* to be against the weight of authority in this Circuit and elsewhere, the court declines to follow this approach.

*United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960)); *see also United States v. Chin,* 934 F.2d 393, 398 (2d Cir.1991) (right to due process violated where "the governmental conduct, standing alone, is so offensive that it shocks the conscience") (quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)).

Outrageousness in the constitutional sense is not established merely by showing obnoxious police behavior or even flagrant misconduct. *United States v. Kelly,* 707 F.2d 1460, 1467 (D.C.Cir.) (Opinion of Ginsburg, J.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983). Rather, a defendant's right to due process "is not transgressed absent 'coercion, violence or brutality to the person.'" *Id.* (quoting *Irvine v. California,* 347 U.S. 128, 132–33, 74 S.Ct. 381, 382–83, 98 L.Ed. 561 (1954)). In the context of the extreme and overwhelming coercion that may be found to violate due process, "there is no meaningful distinction between physical and psychological harm inflicted upon the defendant." *United States v. Cuervelo,* 949 F.2d 559, 565 (2d Cir.1991); *see Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (physical coercion); *Watts v. Indiana,* 338 U.S. 49, 52–53, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949) (psychological coercion).

■ The facts described by DiGregorio and Segnit suggest that the federal agents coerced them to sign certain statements and to cooperate in the ongoing investigation by threats of further detention, immediate prosecution and prosecution of Segnit's son. If the Defendants are to be believed, the agents affected this coercion primarily by keeping DiGregorio and Segnit in ignorance their rights by (1) failing to present them before a judicial officer for five months, (2) denying their requests to obtain counsel, and (3) inhibiting them from obtaining counsel after their release lest they lose their "immunity." Thus, the ker-

nel of Defendants' claim of outrageousness is a claim that they were denied their right to counsel, guaranteed by the Fifth and Sixth Amendments.

There is no doubt that the agents' behavior, as depicted by the Defendants, was despicable.[14] It simply will not do to have federal agents purposefully perverting the constitutionally protected right to counsel to further their investigative efforts. Nevertheless, even assuming that this conduct meets *Russell*'s test of outrageousness, dismissal of the Indictment is not warranted on this basis because the Defendants have failed to show that this behavior resulted in any prejudice to their defense or legal representation. The appropriate remedy is suppression of evidence obtained as a result of the violation, not dismissal of the Indictment. *See, e.g., United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).

In *Morrison,* the defendant had moved to dismiss the indictment against her on the ground that federal agents had violated her right to counsel. The motion was based solely on the egregiousness of the agents' behavior and not upon any allegation that the claimed violation had prejudiced the quality or effectiveness of her legal representation or that the behavior of the agents had induced her to plead guilty, had resulted in the prosecution having a stronger case against her, or had any other adverse impact on her legal position. *Id.* at 363, 101 S.Ct. at 667.

Reversing the Court of Appeals' dismissal of the indictment, the Supreme Court stated that, absent a showing of prejudice to the ability of counsel to provide adequate assistance, a Sixth Amendment violation "provides no justification for interfering with the criminal proceedings against [the defendant] much less [dismissal of the indictment]". *Id.* at 366–67, 101 S.Ct. at 669. While recognizing the "fundamental

---

**14.** At the same time, this conduct was not constitutionally outrageous. *Compare, e.g., Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (government attempted forcibly to remove drug capsules from defendant's throat and forcibly pumped his stomach); *Watts v.*

*Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (defendant held in solitary confinement for one week, during which he was deprived of food and a place to sleep, and neither advised of his rights or provided with counsel).

importance of the right to counsel in criminal cases," the court wrote that:

> when before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order anew trial if the evidence has been wrongfully admitted and the defendant convicted.

*Id.* at 365, 101 S.Ct. at 668. Continuing, the Court held that:

> [t]he premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial. More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.

*Id.*

The behavior here alleged to be constitutionally outrageous boils down to a deliberate and ongoing denial of the Defendants' right to counsel. Because the Defendants have failed to show "demonstrable prejudice" to the interests discussed in *Morrison*, dismissal of the Indictment on this ground is inappropriate.

*Speedy Trial Act*

Despite the legal inadequacy of Defendants' Rule 5(a) and constitutional claims, however, the Speedy Trial Act claim raises a cognizable defense to prosecution.

Section 3161(b) of Title 18 of the United States Code provides in relevant part that:

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.

Section 3162(a)(1) provides that the appropriate sanction for violation of § 3161(b) is dismissal of the indictment. It is within the discretion of the court to determine whether the dismissal should be with or without prejudice based on consideration of (1) the seriousness of the offense, (2) the facts and circumstances of the case which led to the dismissal, and (3) the impact of a reprosecution on the administration of the Speedy Trial Act and on the administration of justice. 18 U.S.C. § 3162(a)(1).

■ The Defendants argue that the delay of approximately seven months between the February 27, 1991 arrests and the October 8, 1991 indictment violates § 3161(b)'s requirement that an indictment be returned within thirty days of arrest. In the plain-meaning world, where an "arrest" is an arrest, it could be concluded without further delay that § 3161(b)'s thirty-day clock was triggered on February 27, 1991 when DiGregorio and Segnit were taken into federal custody. Nevertheless, the judicial consensus, joined by the Second Circuit, is that an individual is not "arrest[ed]" for purposes of § 3161(b) if he is " 'promptly released from federal custody without the Government filing formal charges.' " *United States v. Bloom,* 865 F.2d 485, 490 (2d Cir.) (quoting *United States v. Johnson,* 815 F.2d 309, 312 (5th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988)), *cert. denied,* 490 U.S. 1027, 109 S.Ct. 1762, 104 L.Ed.2d 197 (1989); *see also, e.g., United States v. Amuny,* 767 F.2d 1113, 1118, *reh. denied en banc,* 775 F.2d 301 (5th Cir. 1985); *United States v. Reme,* 738 F.2d 1156, 1162 (11th Cir.1984), *cert. denied sub nom., Pierrot v. United States,* 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985); *United States v. Janik,* 723 F.2d 537, 542 (7th Cir.1983); *United States v. Sanchez,* 722 F.2d 1501, 1509 (11th Cir.), *cert. denied sub nom., Gonzalez v. United States,* 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984); *United States v. Maruska,* 717 F.2d 1222 (8th Cir.1983); *United States v. Alfarano,* 706 F.2d 739, 741 (6th Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v.*

*Candelaria,* 704 F.2d 1129, 1132 (9th Cir. 1983).

Relying on *United States v. Bloom,* 865 F.2d 485, 490 (2d Cir.1989), the Government contends that, since formal charges have never been filed against DiGregorio and Segnit, they were never "arrest[ed]" for purposes of starting the thirty-day clock. While conceding that federal charges have never been filed, the Defendants urge that *Bloom* is distinguishable and that the court should find a violation of the Speedy Trial Act notwithstanding the holding in that case.

In *Bloom,* the defendant, Daley, was arrested on April 4, 1985 by agents of the FBI. Daley was advised of and waived his constitutional rights and agreed to cooperate with the Government. He was interrogated in San Diego for six hours and was detained briefly in the MCC. No formal charges were filed. Daley was released, although the Government delayed his return to his home in New York for five days, during which agents instructed him not to discuss the investigation with anyone. The day after his arrest, the Government filed a complaint against and obtained an arrest warrant for Daley which it never executed. Upon his return to New York, Daley was met by federal agents, was taken into custody and was interrogated for thirteen hours after which he was released. It is apparent that, at least as of his return to New York, Daley was represented by counsel. Despite assurances by the Assistant United States Attorney that an indictment was forthcoming, no indictment was issued until February 10, 1987, almost two years after the initial arrest. *Id.* at 488–89.

Denying Daley's motion to dismiss the indictment under §§ 3161(b) and 3162(a)(1), the court wrote the "[a]n arrest that is not for the purposes of answering to criminal charges ... does not begin the thirty-day period." *Id.* at 490. Furthermore, the filing of the complaint did not trigger the Speedy Trial Act because there was no "concurrent action depriving [the] defendant of liberty for the purpose of facing charges." *Id.* at 491. Although the court acknowledged that delaying Daley's return to New York by five days, limiting his communications concerning the investigation and interrogating him upon his return to New York "[e]ach ... deprived Daley of *some degree* of liberty,"

> [b]ecause they were not in connection with the filing of the complaint or for purposes of Daley's facing federal charges, ... they did not constitute the type of imposition that triggers the Speedy Trial Act's timing provisions. *At the time Daley was subjected to these restrictions he was claiming to be voluntarily cooperating with the government's investigation.*

*Id.* (emphasis added).

■ In contrast to the formalistic reading the Government would have this court accord to *Bloom* and its progenitors, these cases and the policies behind the Speedy Trial Act suggest that it is not so much the formal act of filing charges that implicates the Speedy Trial Act but rather the imposition by the federal Government of significant, involuntary restrictions on an individual's liberty. *Cf. United States v. Copley,* 774 F.2d 728, 730 (6th Cir.1985) ("[i]n defining what constitutes an arrest in general, this Court has reasoned that an arrest occurs when law enforcement officials effect a significant deprivation of an individual's liberty"), *cert. denied,* 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986); *United States v. Osunde,* 638 F.Supp. 171, 174 (N.D.Cal.1986) ("It is the restraint on individual liberty not merely procedural stagnation following the filing of formal charges which Congress intended to protect against when it passed the Act.").

In *United States v. Amuny,* 767 F.2d 1113, for instance, the Fifth Circuit held that § 3161's thirty-day clock is not triggered by an arrest "if federal officials in good faith immediately and *unconditionally* release the defendant *and* prefer no federal charges against him." *Id.* at 1120 (emphasis added). And, in *United States v. Janik,* 723 F.2d 537, the Seventh Circuit reasoned that the thirty-day period was not triggered by an arrest where the defendant "was *unconditionally* released from federal custody immediately after being arrested

*and* no federal criminal charge was filed against him at the time." *Id.* at 543 (emphasis added). These cases, as well as the language in *Bloom,* underscored above, indicate that the technical act of filing charges is only part of the Speedy Trial Act consideration. Also relevant is whether the defendant is released free of further restraints or conditions.

Analysis of the policies behind the Speedy Trial Act confirms that perhaps more significant than the actual filing of charges is the defendant's subjective belief that charges have been brought and are pending. As explained in *United States v. Janik,* 723 F.2d 537,

> The purpose of the Speedy Trial Act is to implement the Sixth Amendment's right to a speedy trial, ... *a right designed to limit the time during which criminal charges are hanging over a person's head unresolved....* Therefore, "no Sixth Amendment right to a speedy trial arises until charges are pending" against the person.... *After a person is arrested and before he is arraigned criminal charges are hanging over him in a palpable sense even if he is free on bond* .... The Speedy Trial Act does not protect the man whose peace of mind is disturbed because, although he is not under arrest or out on bail and no charge has been lodged against him, he is likely to be charged.

*Id.* at 543.

In view of these considerations, the court does not agree with the Government's contention that, even assuming the truth of the facts as described by the Defendants, *Bloom* mandates denial of the motion to dismiss the Indictment. Rather, resolution of this motion must be deferred pending an evidentiary hearing to determine the facts relevant to the time of arrest for purposes of triggering the Speedy Trial Act.

### Governmental Misconduct

The Defendants have also stated a cognizable defense to prosecution on the grounds of governmental misconduct. Although dismissal of an indictment on grounds of governmental misconduct is an "extreme" and "drastic" sanction, the court may, in its supervisory function, dismiss an indictment either (1) to eliminate prejudice to a defendant in a criminal prosecution or (2) to help translate the assurances of United States Attorneys into consistent performances by their assistants. *United States v. Rubio,* 709 F.2d 146, 152 (2d Cir.1983); *United States v. Fields,* 592 F.2d 638, 647 (2d Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). Breach of a prosecutorial agreement constitutes prosecutorial misconduct warranting dismissal of an indictment. *Fields,* 592 F.2d at 647 n. 22, 648 (conduct at issue in *United States v. Rodman,* 519 F.2d 1058 (1st Cir.1975), constitutes "egregious" conduct warranting dismissal of indictment; there, SEC breached agreement to "strongly recommend that no prosecution be undertaken in exchange for disclosure of substantial information from defendants"); *see also United States v. Minnesota Mining & Mfg. Co.,* 551 F.2d 1106, 1111–12 (8th Cir.1977) (not abuse of discretion to dismiss indictment where Government breached agreement to forego future criminal prosecutions of defendant corporation if corporation's officials volunteered nature and extent of illegal activity); *cf. United States v. Marcus Schloss & Co., Inc.,* 724 F.Supp. 1123 (S.D.N.Y.1989) (*dictum*) (if not kept, failure of SEC to keep agreement not to indict if defendant entered into consent order could bar indictment).

The Defendants contend that the Government agreed to forego prosecution in return for their continued cooperation; that they indeed did cooperate; and that the Government nevertheless is prosecuting, in breach of its agreement. The Government disputes the existence of any such agreement. Therefore, this claim, along with the Speedy Trial Act claim, warrants an evidentiary hearing to determine the relevant facts.

### Conclusion

For the foregoing reasons, the motion is denied to the extent of the Rule 5(a) and constitutional claims. Because the Speedy Trial Act and prosecutorial misconduct claims state cognizable defenses to prosecution, an evidentiary hearing shall be held

within thirty days of the filing of this opinion to determine the facts relevant to those claims.

It is so ordered.