18-2309-cr
*United States v. Peeples*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2019

No. 18-2309-cr

UNITED STATES OF AMERICA,
*Appellee*,

v.

JOSEPH W. PEEPLES, III,
*Defendant-Appellant*,

On Appeal from the United States District Court
for the Western District of New York

ARGUED: MARCH 31, 2020
DECIDED: JUNE 22, 2020

Before: WALKER, CABRANES, AND SACK, *Circuit Judges*.

Defendant-Appellant Joseph W. Peeples, III ("Peeples") appeals from a judgment of the United States District Court for the Western District of New York (Frank P. Geraci, Jr., *Chief Judge*) convicting him, following a jury trial, of bank robbery, entering a bank with the intent to commit larceny, and bank larceny.

On appeal, Peeples argues that the District Court erred in declining to dismiss the criminal charges against him because: (i) he was transferred outside of the district of arrest to the district where the crime took place without first appearing before a magistrate judge, assertedly in violation of Federal Rule of Criminal Procedure 5(c)(2); and (ii) the magistrate judge failed to sign the affidavit attached to the complaint in alleged violation of Federal Rule of Criminal Procedure 3, even though he signed the face of the complaint. Peeples also challenges the admission of certain testimony at trial.

The two main questions presented in this case are: (1) whether dismissal of a criminal complaint is the appropriate remedy for a violation of Rule 5(c)(2); and (2) whether a magistrate judge's failure to sign the *jurat* on the last page of the affidavit attached to the criminal complaint renders the complaint invalid under Rule 3, even where the magistrate judge did sign the complaint itself.

On review, we conclude that, in the circumstances presented, dismissal of criminal charges is not the appropriate remedy for a violation of Rule 5(c) and the magistrate judge's failure to sign the affidavit attached to the criminal complaint did not render the complaint invalid. We also conclude that Peeples' remaining

2

evidentiary challenges do not warrant a vacatur of his conviction. Accordingly, the judgment the District Court is **AFFIRMED**.

––––––––––

KATHERINE A. GREGORY, Assistant United States Attorney, *for* James P. Kennedy, Jr., United States Attorney, Western District of New York, Buffalo, NY, *for Appellee*.

JILLIAN S. HARRINGTON, Monroe Township, NJ, *for Defendant-Appellant*.

––––––––––

JOSÉ A. CABRANES, *Circuit Judge*:

On January 5, 2017, at approximately 8:20 a.m., Joseph W. Peeples, III ("Peeples") robbed a bank in Rochester, New York and immediately fled the scene.[1] Carrying over $100,000 in large stacks of cash, Peeples needed to escape. His ultimate destination? Unclear, but perhaps Mexico (at least, according to one passing statement by Peeples). His escape plan? Also unclear. Perhaps trying to figure one

---

[1] For purposes of this appeal, where Peeples "has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Lewis v. Jeffers*, 497 U.S. 764, 782 (1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (footnote omitted)). Here, Peeples does not challenge the sufficiency of the evidence at trial to support his criminal conviction.

out on the run, Peeples made several stops. He took a cab and checked in to a hotel in Rochester using his own name. Later that morning, he boarded a Greyhound bus headed for New York City. But he never made it there. Instead, he got off the bus in Binghamton and tried to buy a car. Unable to do so, he found a hotel, booked a room, and asked an employee where he could find a shopping mall and a strip club.

The escape route by way of Binghamton did not turn out to be a successful one for Peeples. Before boarding the bus in Rochester, Peeples accidentally had left behind an unbroken trail of evidence—the sunglasses, sweatshirt, and shirt that he wore during the robbery, and approximately $53,400 in cash. With the assistance of eyewitnesses, extensive video surveillance, and physical evidence, law enforcement agents were able to trace Peeples' steps with notable precision. Eleven hours later, and approximately 140 miles away from the Rochester bank, Peeples, then a guest in the Grand Royale Hotel in Binghamton, was arrested.

Peeples now appeals from a judgment of the United States District Court for the Western District of New York (Frank P. Geraci, Jr., *Chief Judge*) convicting him, following a jury trial, of bank robbery, entering a bank with the intent to commit larceny, and bank larceny. On appeal, Peeples contends that his judgment of conviction should be vacated for two principal reasons.

*First*, Peeples argues that the District Court erred in declining to dismiss the criminal charges against him because: (i) he was transferred outside of the district of arrest to the district where the

4

crime took place without first appearing before a magistrate judge, in asserted violation of Federal Rule of Criminal Procedure 5(c)(2);[2] and (ii) the magistrate judge failed to sign the affidavit attached to the complaint in alleged violation of Federal Rule of Criminal Procedure 3,[3] even though he signed the face of the complaint.

*Second*, Peeples argues that the District Court erred in admitting: (i) the bank employees' testimony identifying Peeples for the first time at trial in alleged violation of his due process rights; and (ii) physical evidence seized from the Binghamton hotel room in alleged violation of his right to be free from unreasonable searches and seizures.

---

[2] Rule (c)(2) provides in relevant part:

> If the defendant was arrested in a district other than where the offense was allegedly committed, the initial appearance must be:
>
>> (A)    in the district of arrest; or
>>
>> (B)    in an adjacent district if:
>>
>>> (i)  the appearance can occur more promptly there; or
>>>
>>> (ii) the offense was allegedly committed there and the initial appearance will occur on the day of the arrest.

[3] Rule 3 provides: "The complaint is a written statement of the essential facts constituting the offense charged. Except as provided in Rule 4.1, it must be made under oath before a magistrate judge or, if none is reasonably available, before a state or local judicial officer."

The two main questions presented in this case are: (1) whether dismissal of a criminal complaint is the appropriate remedy for a violation of Federal Rule of Criminal Procedure 5(c); and (2) whether a magistrate judge's failure to sign the *jurat* on the last page of the affidavit attached to the criminal complaint renders the complaint invalid under Federal Rule of Criminal Procedure 3, even where the magistrate judge did sign the complaint itself.[4]

We conclude that, in the circumstances presented, the dismissal of criminal charges is not the appropriate remedy for a violation of Rule 5(c) and that the magistrate judge's failure to sign the affidavit attached to the criminal complaint did not render the complaint invalid. We also conclude that Peeples' remaining evidentiary challenges do not warrant vacatur of his conviction. Accordingly, the August 1, 2018 judgment the District Court is **AFFIRMED**.

## BACKGROUND

When Peeples entered a Chase Bank in Rochester on January 5, 2017, he was wearing a black knit cap, gold rimmed sunglasses, a black pullover sweatshirt, black jeans, and black boots. There were two bank

---

[4] "A jurat is in reality a certificate of the officer who administered the oath that the affiant had subscribed and sworn to the same before him." *United States v. McDermott*, 140 U.S. 151, 153 (1891); *see also Dawson v. Phillips*, Case No. 03-cv-8632 (RJS) (THK), 2008 WL 818539, at *1 n.3 (S.D.N.Y. Mar. 25, 2008) ("A 'jurat' is a 'certification added to an affidavit . . . stating when and before what authority the affidavit . . . was made'; a 'certificate' is a 'document in which a fact is formally attested.'" (quoting *Black's Law Dictionary* (8th ed. 2004)).

employees present: Jeannine Furioso and Patricia Bentley. Pretending to have trouble with his bank account, Peeples approached Furioso and handed her a black bag and a note with robbery instructions. The note said: "listen, you need to cooperate, I want large bills, otherwise everybody will die today."[5]

Upon receipt of the threatening note, Furioso nervously walked over to Bentley in the teller line and handed her the bag so that Bentley could retrieve the money. Peeples objected. He "want[ed] the money out of the vault," not "out of [teller] drawer."[6] He also exclaimed, "I'm not playing around, I've done this before, hurry up."[7] Peeples, who appeared to have something in the front of his pullover sweatshirt, had given the impression to Furioso and Bentley that he was carrying a "gun," a "bomb," or some kind of "weapon."[8]

Furioso and Bentley entered their combinations to open the vault. Once inside the vault, Peeples began to put stacks of cash in his black bag. He then exited the bank as he had entered: through the front door, but now with more than $100,000 in his bag. Furioso immediately notified security and called the police.

As confirmed by surveillance video and the eyewitness testimony of a parking garage attendant, a man wearing all black and

---

[5] Trial Transcript at 123.

[6] *Id.* at 127, 175.

[7] *Id.* at 176.

[8] *Id.* at 133, 191.

7

carrying a black bag, identified at trial as Peeples, was seen minutes after the robbery running down the bank's stairs and towards the cab stand at the nearby Hyatt Hotel. There, around 8:30 a.m., Peeples got into a J & J taxicab. According to the cab driver, they arrived at a Greyhound bus station around 8:47 a.m. The driver gave Peeples a business card and, as Peeples rushed out of the cab, he left behind in the back seat his sunglasses, the black sweatshirt, and $9,900 in the sweatshirt's pockets, all of which was recovered by the Rochester police. As shown on video, Peeples entered the bus station and headed to the men's bathroom. Minutes later, he came out of the bathroom wearing different clothing and placed something in the garbage can outside the bathroom. It was not mere trash though, but rather, a black shirt and $43,500 in cash, also recovered by Rochester police.

Video surveillance showed Peeples leaving the station and getting into another taxi. According to the testimony of Gurmit Ram, the driver of the second taxi, Peeples headed to a Quality Inn Hotel. The hotel's general manager, in testimony at trial, confirmed Peeples' brief visit to the Quality Inn. According to the manager, an individual who identified himself as "Joseph W. Peeples, III" and was carrying large amounts of cash checked in to the hotel that morning. Peeples left the hotel and returned to the bus station about an hour later in Ram's cab. According to video surveillance, around 10:15 a.m., Peeples entered the bus station and purchased a bus ticket to New York City. At approximately 10:45 a.m., Peeples boarded the bus; but he did not arrive at his apparent destination. Instead, according to the bus driver, between 2:10 and 2:20 p.m., Peeples got off the bus in Binghamton.

In Binghamton, Peeples got into another taxi. According to the driver, Youssif Saleh, Peeples asked to be driven to various places. First, he went to a liquor store. Then, wanting to buy a car in cash, Peeples went to a car dealership. Realizing that he needed insurance to buy the car, Peeples headed to a State Farm location. But that did not work for Peeples either. Unable to buy insurance or a car, Peeples opted to look for a hotel.

The first two hotels Peeples tried refused to book him a room without a credit card. Then, Saleh drove Peeples to the Grand Royale Hotel, where Peeples was finally able to book a room (Room 310) for $600 in cash. Saleh gave Peeples his business card and left. Once settled in, Peeples asked a hotel employee where he could find a shopping mall and a strip club.

At 9:00 p.m., having traced Peeples' movements by reviewing video surveillance material and speaking with several eyewitnesses, Special Agent John Bokal of the Federal Bureau of Investigation ("FBI") arrived at the Grand Royale Hotel. Joined by a hotel employee, Special Agent Bokal headed to Room 310 to look for Peeples. On their way to the room, they ran into Peeples, who was sitting on the stairs, and Special Agent Bokal immediately placed Peeples under arrest. In response, Peeples asked the employee, "[W]ho ratted me out, was it you?"[9] He also exclaimed, "you know they're after me," "you were

---

[9] *Id*. at 567.

supposed to let me get to Mexico," "you know what I did," and "don't go in my room without a warrant."[10]

Peeples was taken away and detained in the Binghamton Police Department—in the Northern District of New York—where he was questioned by Special Agent Bokal. At the police station, after waiving his *Miranda* rights, Peeples confessed to: (1) having robbed the Chase bank in Rochester; (2) accidentally leaving the money in the back seat of the J & J Taxi and in the garbage can at the Greyhound bus station in Rochester; and (3) hiding the remaining stacks of cash inside Room 310. In the meantime, police officers were posted outside of Room 310 to secure the area pending a search warrant.

The next day, on January 6, 2017, a magistrate judge in the Northern District of New York approved the search warrant application. Police officers executed the warrant in Room 310 and found, among other things, $48,700 in cash; business cards from the J & J Taxi driver, from Ram, and from Saleh; a bag; a room key to a Quality Inn Hotel; a Greyhound bus ticket from Rochester to New York City for a January 5, 2017, 10:55 a.m. bus; and a benefits card and a Chase card in Peeples' name.

That same day, January 6, Peeples was transported back to Rochester, where he was brought, at about 3:50 p.m., before a magistrate judge in the Western District of New York for his initial appearance. Notwithstanding the magistrate judge's repeated

---

[10] *Id*.

10

admonitions about the advantages of being represented by counsel during his criminal prosecution, and the disadvantages of not being represented by an attorney, Peeples elected to proceed *pro se*. In fact, Peeples represented himself throughout the criminal proceedings, including trial, while maintaining a court-appointed counsel on standby. After a 90-minute deliberation, the jury found Peeples guilty on all three counts.

On July 27, 2018, the District Court sentenced Peeples to 240 months' imprisonment on Count 1 (Bank Robbery) and Count 2 (Entering a Bank With Intent to Commit Larceny), to run concurrently with 120 months' imprisonment on Count 3 (Bank Larceny), to be followed by 3 years of supervised release. This appeal followed.

## DISCUSSION

On appeal, Peeples argues that his judgment of conviction should be vacated because the District Court erred in failing to dismiss the criminal complaint against him and in failing to exclude certain evidence introduced at trial. In considering his challenge on appeal, we review *de novo* any questions of law arising from the District

Court's judgment,[11] any evidentiary ruling for "abuse of discretion,"[12] and any findings of fact for "clear error."[13]

Furthermore, we will reverse an evidentiary ruling only in instances of "manifest error."[14] And "even where we conclude that an evidentiary ruling was 'manifestly erroneous,' we will nonetheless affirm if the error was 'harmless'—that is, if we can conclude that the error did 'not affect substantial rights.'"[15] In determining whether an erroneous admission was harmless, we consider: "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the

---

[11] *See All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 911 F.3d 104, 109 (2d Cir. 2018).

[12] *See United States v. Miller*, 626 F.3d 682, 687–88 (2d Cir. 2010). "A district court has 'abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence,' *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 . . . (1990), or rendered a decision that 'cannot be located within the range of permissible decisions,' *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (alteration omitted).

[13] *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015) ("A finding of fact is clearly erroneous only if, after reviewing all of the evidence, this Court is left 'with the definite and firm conviction that a mistake has been committed.'" (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

[14] *Miller*, 626 F.3d at 688–89 (collecting cases and explaining that "we find 'manifest error' only where we are 'persuaded that the trial judge ruled in an arbitrary and irrational fashion.'" (quoting *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001)).

[15] *Id.* at 688 (quoting Fed. R. Crim. P. 52(a); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 119 (2d Cir. 2006)).

wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence."[16]

For the reasons stated below, we reject Peeples' challenges on appeal and thus affirm the District Court's judgment of conviction.

## I.     The Remedy for an Alleged Violation of Federal Rule of Criminal Procedure 5(c)(2)

Peeples argues that the District Court should have dismissed the criminal charges against him because he was transferred outside of the district of his arrest (N.D.N.Y.) to the district where the crimes took place (W.D.N.Y.), without first appearing before a magistrate judge in the Northern District, in asserted violation of Rule 5(c)(2) of the Federal Rules of Criminal Procedure. We disagree.

Rule 5 of the Federal Rules of Criminal Procedure governs the procedures relating to a defendant's initial appearance.[17] More specifically, Rule 5(c)(2) provides:

> If the defendant was arrested in a district other than where the offense was allegedly committed, the initial appearance must be:
>
>     (A) in the district of arrest; or

---

[16] *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010) (quotation marks and citation omitted).

[17] Fed. R. Crim. P. 5 (entitled, "Initial Appearance").

13

(B) in an adjacent district if:

  (i)   the appearance can occur more promptly there; or

  (ii)  the offense was allegedly committed there and the initial appearance will occur on the day of arrest.

Relatedly, Rule 5(a)(1)(A) provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."

There is no question that Peeples was arrested in a district other than the district where the bank robbery was committed. Therefore, under Rules 5(a)(1)(A) and 5(c)(2), the Government needed to take Peeples, without unnecessary delay, before a magistrate judge in: (1) the Northern District; (2) an adjacent district (such as the Western District), *if* Peeples' appearance could occur more promptly in that adjacent district than in the Northern District; or (3) the Western District, *if* the initial appearance would have taken place on the same day of the charged robbery (January 5).[18]

As noted above, Peeples was taken to the Western District for his initial appearance on January 6 at about 3:50 p.m. To satisfy Rule 5(c)(2), the Government was required to show that an initial appearance in the Northern District could not have occurred sooner,

---

[18] *See* Fed. R. Crim. P. 5(c)(2).

14

thereby justifying Peeples' transfer to the Western District. The Government did not attempt to make this showing. Nor does it now contest Peeples' assertion that his transfer to the Western District for an initial appearance was a technical violation of Rule 5(c)(2). Instead, the Government notes that it agreed not to introduce at trial Peeples' post-arrest statements, including his confession to Special Agent Bokal at the Binghamton Police Department.

Peeples argues that the Government's decision is not enough; the District Court was required, in his view, to dismiss the charges against him, because, he asserts, dismissal of the charges is the only proper remedy for a violation of Rule 5(c)(2). Alternatively, Peeples argues that the search warrant issued by the magistrate judge in the Northern District and the criminal complaint filed against him in the Western District were invalid because the affidavits in support of both documents relied in part upon Peeples' post-arrest statements. We address and reject each argument in turn.

## A.

Peeples' principal argument that dismissal of a criminal case is the only proper remedy for a violation of Rule 5(c)(2) lacks merit. As a threshold matter, the dismissal of criminal charges has no basis in the text of Rule 5(c)(2). And perhaps more critically, that proposed remedy cannot be reconciled with the precedents of the Supreme Court and our own Court in the closely related context of Rule 5(a)(1)(A)'s limitation on post-arrest, pre-arraignment investigations. Those precedents are instructive and apply with equal force to the present

15

circumstances; they consistently refer to the application of evidentiary sanctions (*e.g.*, the exclusion of evidence), not dismissal of criminal charges, as the appropriate remedy for a violation of the rule.

**1.**

"Rule 5(a)(1)(A) requires law enforcement to present arrestees [to a magistrate judge] 'without unnecessary delay.'"[19] But even before the enactment of Rule 5(a), "[t]he common law obliged an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could."[20] The longstanding remedy for a violation of "this prompt-presentment requirement" is the suppression of any prejudicial post-arrest statements, including "a defendant's confession."[21]

For more than seven decades, the Supreme Court has made it clear that the failure to present a defendant promptly before a judicial officer may render a defendant's post-arrest confession inadmissible.[22] Put another way, the "evidentiary rule of exclusion [ ] formulated by

---

[19] *United States v. Gonzalez*, 764 F.3d 159, 167 (2d Cir. 2014) (quoting Fed. R. Crim. P. 5(a)(1)(A)).

[20] *Corley v. United States*, 556 U.S. 303, 306 (2009).

[21] *United States v. Redlightning* 624 F.3d 1090, 1106 (9th Cir. 2010) (internal quotation marks omitted).

[22] *See, e.g., Corley*, 556 U.S. at 322; *United States v. Alvarez-Sanchez*, 511 U.S. 350 (1994); *Mallory v. United States*, 354 U.S. 449 (1957); *Upshaw v. United States*, 335 U.S. 410 (1948); *McNabb v. United States*, 318 U.S. 332 (1943).

the Supreme Court" has long been the "judicial technique utilized for the enforcement of [the prompt-presentment requirement in] Rule 5(a)."[23] To that end, we have stated that "we will *exclude* confessions obtained following an unnecessary or unreasonable delay in presentment,"[24] and that such exclusions may be necessary to deter any "continuing practice of unnecessarily delaying arraignments."[25]

Although the history of the prompt-presentment requirement codified in Rule 5(a) reflects an evolving understanding of what constitutes a violation of that requirement,[26] that same history confirms that the remedy for such a violation is the exclusion of evidence, not dismissal of a criminal case.[27] And, as some of our sister

---

[23] *United States v. Klapholz*, 230 F.2d 494, 496 (2d Cir. 1956).

[24] *Gonzalez*, 764 F.3d at 167 (citing *Corley*, 556 U.S. at 322) (emphasis added).

[25] *United States v. Fullwood*, 86 F.3d 27, 32 (2d Cir. 1996) (citing *United States v. Colon*, 835 F.2d 27, 31 (2d Cir. 1987)).

[26] *See, e.g., Corley*, 556 U.S. at 306–11, 322; 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King, and Orin S. Kerr, *Criminal Procedure* § 6.3(b) (4th ed. 2009) (as supplemented) (describing the reactions to the Supreme Court's *McNabb-Mallory* rule over the years); 1 Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 72 (4th ed. 2008) (as supplemented) ("Timing of the Initial Appearance").

[27] *See Corley*, 556 U.S. at 322 (relying on, among other things, the Advisory Committee's Notes on Federal Rule of Evidence 402 which explains that "the effective enforcement of . . . Rule 5(a) . . . is held to require the exclusion of statements elicited during detention in violation thereof" (internal quotation marks and citations omitted)); *see also Gonzalez*, 764 F.3d at 167–68 (analyzing the prompt-presentment requirement in terms of whether the elicited confession should be excluded); *Fullwood*, 86 F.3d at 32 (same); *Colon*, 835 F.2d at 31 (same); *United States*

17

Circuits have held, "the appropriate remedy for a violation of Rule 5(a)(1)(A) is not dismissal of an indictment, but suppression of evidence illegally obtained as a result of the violation."[28]

## 2.

The remedy of exclusion of evidence is not unique to Rule 5(a), as it is not specific to its text or circumstances. The evidentiary sanction of exclusion reflects the broader principle that prejudicial evidence obtained as a result of governmental misconduct may be excluded to safeguard defendants' rights through the deterrence of similar future misconduct by the Government.[29] That principle applies with equal

---

*v. Perez*, 733 F.2d 1026, 1031–32 (2d Cir. 1984) (same); *United States v. Rubio*, 709 F.2d 146, 153–54 (2d Cir. 1983) (same).

[28] *United States v. Cooke*, 853 F.3d 464, 471 (8th Cir. 2017); *see, e.g., United States v. Dyer*, 325 F.3d 464, 470 n.2 (3d Cir. 2003) (same); *Bayless v. United States*, 381 F.2d 67, 70–71 (9th Cir. 1967) (same); *see also United States v. Bibb*, 194 F. App'x 619, 623 (11th Cir. 2006) (non-precedential summary order pursuant to Fed. R. App. P. 32.1 and 11th Cir. R. 36-2, 36-3) (same).

Various district courts also have reached the same conclusion. *See, e.g., United States v. Savchenko*, 201 F.R.D. 503, 509 (S.D. Cal. 2001) ("Rule 5 . . . is not a general remedial statute, but rather a rule designed to deal with a particular problem by applying an evidentiary sanction. . . . In this case, even if the delay in transport of the defendants from the high seas to the district court were found unnecessary or unreasonable, those facts alone would not justify dismissal since that is not a sanction available under Rule 5."); *United States v. Perez-Torribio*, 987 F. Supp. 245, 247 (S.D.N.Y. 1997) ("Unnecessary delay violations of Rule 5(a) warrant suppression of evidence," not dismissal of the indictment); *United States v. DiGregorio*, 795 F. Supp. 630, 634 (S.D.N.Y. 1992) (same).

[29] *See Rubio*, 709 F.2d at 153 (concluding that, in the absence of wrongdoing by the Government, the district court correctly denied the defendant's motion to

force to violations of Rule 5(c)(2)'s own prompt-presentment requirement. We see no reasonable basis to adopt a different remedy here with respect to Rule 5(c)(2), nor does Peeples provide a reasoned justification to do so.

By its own terms, Rule 5(c)(2) governs the place of a defendant's initial appearance, as well as the circumstances permitting the defendant's transfer to another district. As described above, the rule requires the defendant's initial appearance to take place in the district of the defendant's arrest.[30] Alternatively, the initial appearance could take place in a district adjacent to the district of arrest if one or another circumstance is met: (1) the appearance can occur more promptly in the adjacent district than in the district of arrest; or (2) the alleged crime took place in the adjacent district and the initial appearance will occur on the same day of the arrest.[31]

As revealed by the text of Rule 5(c)(2), one of the main concerns, if not the principal one, animating its procedural requirements is precisely the same concern that animates the requirement in Rule 5(a)(1)(A): that a defendant be presented to a judicial officer for his or

---

suppress his post-arrest statements under Rule 5(a)); *cf. Herring v. United States*, 555 U.S. 135, 139–40 (2009) (explaining that, in the context of the Fourth Amendment, the Supreme Court's "decisions establish an exclusionary rule that . . . is designed to safeguard Fourth Amendment rights generally through its deterrent effect" (internal quotation marks and citations omitted)).

[30] *See* Fed. R. Crim. P. 5(c)(2)(A).

[31] *See* Fed. R. Crim. P. 5(c)(2)(B).

her arraignment as soon as practicable in order to prevent the Government from using the delay to obtain incriminating evidence or elicit a confession.[32] It follows that the exclusion of prejudicial, post-arrest evidence obtained in violation of Rule 5(c)(2) may be an appropriate and fully satisfactory remedy for certain violations of that rule, as it is for violations of Rule 5(a)(1)(A).[33]

**3.**

---

[32] *Cf. United States v. Marrero,* 450 F.2d 373, 376 (2d Cir. 1971) ("It is not the lapse of time but the use of the time . . . to employ the condemned psychologically coercive or third degree practices [of interrogators] which is proscribed."); *see also Rubio*, 709 F.2d at 153–54 (explaining that a "lapse of hours between arrest and arraignment, standing alone, does not require the exclusion of a statement made during the period" because there must be some ensuing "prejudice" to the defendant as a result of the Government's wrongdoing); *United States v. Middleton*, 344 F.2d 78, 82 (2d Cir. 1965) ("The objective of Rule 5(a) is to check resort to psychologically coercive or 'third degree' practices and not simply to insure that the accused is arraigned at the earliest possible time." (internal citation omitted)).

[33] We do not address here, much less consider, whether an egregious delay in arraignment may violate some other right, such as the constitutional guarantee to due process, which may in turn provide the basis for a more drastic remedy in a criminal proceeding, including dismissal. *Cf. Savchenko*, 201 F.R.D. at 509 ("Where government delay or outrageous conduct leads to a request for a dismissal, a basis beyond Rule 5 must be used if defendant truly hopes to succeed. The Due Process Clause of the U.S. Constitution and the Acts of Congress stated herein are well designed to address those circumstances."); *United States v. Egan,* 501 F. Supp. 1252, 1263 (S.D.N.Y. 1980) (analyzing the violation of the prompt-presentment requirement in terms of the suppression of post-arrestment statements, but also concluding that the "dismissal of the indictment" was not warranted because the arraignment delay did "not rise to the level of outrageous conduct which shocks the conscience").

Here, the Government did not rely on Peeples' post-arrest statements as part of its evidence at trial. Therefore, with respect to the trial proceedings, Peeples cannot show that his transfer to the Western District in violation of Rule 5(c)(2) caused him *any* prejudice. "There having been no evidence [used at trial] which could have been excluded, on motion, on these grounds," the District Court correctly concluded that there was no further remedy available to Peeples and thus his motion "to dismiss the [complaint] . . . was correctly denied."[34]

**B.**

To our knowledge, Peeples' post-arrest statements to Special Agent Bokal were only used in the application for the search warrant executed at the Grand Royale Hotel and in the criminal complaint filed against Peeples. But, in the circumstances presented, that reliance did not render the warrant or the complaint invalid, nor did it require the dismissal of the ensuing criminal charges against Peeples.

As a threshold matter, we note that Peeples has not pointed to *any* evidence in the record justifying the exclusion of the post-arrest statements from the affidavits in support of the search warrant and the criminal complaint. Nothing in the record of this case supports an inference, let alone demonstrates, that the Government violated Rule

---

[34] *Bayless*, 381 F.2d at 71; *see* Appellant's App'x at 127 (Decision of the District Court denying Peeples' motion because "the only evidence obtained between Peeples'[ ] arrest and his initial appearance were the statements he made to law enforcement" and since "the Government does not intend to use Peeples'[ ] statements in its case . . . there is no remedy available to Peeples").

5(c)(2) in order to obtain a post-arrest, pre-arraignment confession from Peeples.[35] Without evidence of wrongdoing, there is "nothing to deter" and "exclusion simply cannot pay its way."[36]

In any event, although unlawfully obtained evidence should not be included in an affidavit,[37] it is well established that "[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant."[38] In those circumstances, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant" or file a criminal complaint.[39]

Even if we were to excise Peeples' post-arrest statements from the affidavits in support of the application for the search warrant and in support of the criminal complaint, there is ample untainted evidence in the affidavits supporting the magistrate judge's probable cause findings. Law enforcement officials were able to trace Peeples'

---

[35] *Cf. Rubio*, 709 F.2d at 153 (affirming the denial of the defendant's motion to suppress because, among other things, "there was no purposeful postponement of arraignment, and no lengthy, hostile, or coercive interrogation which caused the [defendant] prejudice"); *see also ante* note 32.

[36] *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (internal quotation marks and citation omitted).

[37] *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963).

[38] *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997) (citation omitted).

[39] *Id.* (citation omitted).

steps from Rochester to Binghamton with commendable precision by relying on the testimony of witnesses, extensive video surveillance, and physical evidence that Peeples left behind in Rochester.

Specifically, the affidavits pointed to, among other things, the testimony of the bank employees, video surveillance from the Hyatt Hotel in Rochester, the testimony of the two taxi drivers in Rochester, the money and items left in the back seat of the J & J taxi, video surveillance from the Greyhound bus station in Rochester, the money and shirt discarded in the garbage can of the bus station, video surveillance from the Quality Inn Hotel in Rochester, testimony of the Quality Inn's manager, video surveillance from the Binghamton bus station, testimony of the taxi driver in Binghamton, testimony of the employees of the Grand Royale Hotel in Binghamton, and items seized from Peeples during his arrest.[40]

Peeples' confession and post-arrest statements merely corroborated what abundant "extrinsic evidence independently secured through skillful investigation"[41] already revealed: there was probable cause to believe that Peeples robbed the Chase bank in Rochester and was hiding the stolen money in his hotel room in Binghamton.

---

[40] *See* Government's App'x at 4–8 (Special Agent Bokal's affidavit in support of the application for a search warrant of Room 310); *see also* Appellant's App'x at 17–21 (Special Agent Fleitman's affidavit in support of the criminal complaint).

[41] *Escobedo v. Illinois*, 378 U.S. 478, 489 (1964).

Accordingly, Peeples failed to demonstrate that the Government's violation of Rule 5(c)(2) had any prejudicial effect whatsoever on the criminal case against him.

## II. The Magistrate Judge's Signature of the Criminal Complaint Under Federal Rule of Criminal Procedure 3

Peeples correctly notes that Magistrate Judge Jonathan Feldman of the Western District did not sign the *jurat* on the last page of the affidavit submitted by Special Agent Seth Fleitman of the FBI. Judge Feldman did sign, however, the *jurat* on the face of the criminal complaint against Peeples, to which the affidavit was attached. Peeples argues that the magistrate judge's failure to sign the affidavit rendered the complaint invalid under Rule 3 of the Federal Rules of Criminal Procedure and that, as result, the District Court erred in declining to dismiss the complaint. In the circumstances presented here, we see no error in the District Court's decision to not dismiss the complaint.

Rule 3 provides in relevant part that a criminal complaint is "a written statement of the essential facts constituting the offense[s] charged," which "must be made under oath before a magistrate judge or, if none is reasonably available, before a state or local judicial officer." By failing to sign the *jurat* on the last page of the affidavit, Peeples argues, the magistrate judge failed to attest that the assertions made in the affidavit were made under oath. The argument carries little weight in light of the facts presented here.

24

As a threshold matter, the text of Rule 3 merely requires that the complaint be made under oath before the magistrate judge. It may well be that the magistrate judge's signature in the affidavit in support of the criminal complaint constitutes the best evidence that Rule 3's requirement was met. It does not follow, however, that anything else falls short of satisfying Rule 3.

By its own terms, Rule 3 refers to the criminal complaint itself, and not to any affidavit presented in support of the complaint. Here, both Judge Feldman and Special Agent Fleitman signed the criminal complaint, which expressly references the affidavit (or "sheet") by Special Agent Fleitman that is attached to the complaint.[42] By signing the complaint, Judge Feldman confirmed that Special Agent Fleitman swore to the truth of the assertions made in the affidavit in Judge Feldman's own presence.[43] Rule 3 does not require more.

Even if we were to assume, for the sake of argument only, that Judge Feldman erred in failing to sign Special Agent Fleitman's affidavit, that error did not render the complaint invalid. To reach this conclusion, we draw guidance from sources in two closely related contexts.

*First*, as revealed in one compendium of practice in the various American jurisdictions, under the law of many states, it is the case that

---

[42] *See* Appellant's App'x 16 (Criminal Complaint).

[43] *See id.* (stating that the complaint was "[s]worn to before [the magistrate judge] and signed in [his] presence").

"[g]enerally, the omission of a jurat is not fatal to the validity of an affidavit so long as it appears either from the instrument itself or from outside evidence that the affidavit was, in fact, duly sworn to before an authorized officer."[44] Moreover, "in the absence of a jurat, the fact may be proved by outside evidence from a source other than the document itself" and "in the face of an incomplete or defective jurat, many states allow extrinsic evidence to prove that the affidavit was properly sworn."[45]

*Second*, we also have stated that "minor errors in an affidavit are not cause for invalidating the [document] that it supports."[46] In examining warrant applications and their underlying affidavits, for example, the Supreme Court has admonished "magistrates and courts" to "test[ ] and interpret[ ]" them "in a commonsense and realistic fashion," rather than in "a hypertechnical . . . manner."[47]

These two contexts—namely, the predominant understanding across our country of the validity of affidavits and the Supreme Court's teaching on the interpretation of warrant applications—guide our analysis of the present situation. Just as we uphold warrants "despite 'technical errors,' . . . when the possibility of actual error is

---

[44] 2A C.J.S. *Affidavits* § 28 (2020) (footnotes omitted and collecting cases).

[45] *Id.* (footnotes omitted and collecting cases).

[46] *United States v. Waker*, 534 F.3d 168, 171 (2d Cir. 2008).

[47] *United States v. Ventresca*, 380 U.S. 102, 108–09 (1965).

eliminated by other information,"[48] here, any possible error or confusion has been eliminated by Judge Feldman's signature of the complaint and his confirmation that Special Fleitman swore to the truth of the assertions made in the affidavit in Judge Feldman's presence.

In sum, in the circumstances presented here, the District Court did not err in declining to dismiss the criminal complaint against Peeples.

### III.    Peeples' Evidentiary Challenges

Peeples argues that his conviction should be vacated because the District Court erred in admitting: (1) identification testimony at trial in violation of his due process rights; and (2) evidence seized from Room 310 in violation of his Fourth Amendment rights. We disagree.

### A.

Peeples first argues that his in-court identification by Furioso and Bentley, the Chase bank employees who were the victims of Peeples' robbery, was unduly suggestive and should have been excluded. To Peeples, the evidentiary ruling was so manifestly erroneous that a vacatur of his conviction is imperative. The argument lacks merit.

---

[48] *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir. 1994).

Due process requires identification testimony to be excluded if it is so unreliable as to create "a very substantial likelihood or irreparable misidentification."[49] In the context of in-court identifications, we have admonished district courts to ensure that any in-court identification procedure employed does not amount to a "show-up."[50]

Here, the Government and Peeples agree that Peeples' appearance had changed significantly between the time of the robbery and the trial. Concerned with the possibility of undue suggestibility of an in-court identification, Peeples, who was proceeding *pro se*, asked the District Court if he could be seated elsewhere in the courtroom during the testimony of Furioso and Bentley. The request was arguably a reasonable one given the absence of an identification of Peeples prior to trial, the fact that Peeples' appearance had changed, and the fact that a defendant's traditional seating in a courtroom is inherently suggestive.[51] Nonetheless, the District Court, without explanation, denied the request for this special in-court procedure.

---

[49] *Simmons v. United States*, 390 U.S. 377, 384 (1968).

[50] *United States v. Archibald*, 734 F.2d 938, 941, *modified*, 756 F.2d 223 (2d Cir. 1984).

[51] See *id.* (explaining that the traditional seating of a defendant in the courtroom is "obviously suggestive" and that "[a]ny witness, especially one who has watched trials on television, can determine which of the individuals in the courtroom is the defendant, which is the defense lawyer, and which is the prosecutor").

The Government argues that Peeples was required to move for a line-up order prior to trial. A line-up order would have "assure[d] that the identification witness will first view the suspect with others of like description rather than in the courtroom sitting alone at the defense table."[52] According to the Government, only if that request for a line-up order had been "denied or the decision reserved would special in-court procedures possibly have been warranted."[53] Because Peeples did not move for such an order, the Government contends, Peeples "should not now be heard to complain about the alleged [suggestibility] of in-court identifications."[54]

We agree with the Government that there is no evidence in the record "that the in-court identifications were irreparably tainted by [suggestibility]."[55] Indeed, Furioso and Bentley notably testified that they were confident in their in-court identification of Peeples,[56] and Furioso even identified Peeples as the robber by his voice.[57] In any event, we need not decide whether the District Court erred in

---

[52] *United States v. Brown*, 699 F.2d 585, 594 (2d Cir. 1983).

[53] Government's Br. at 26 (citing *Archibald*, 756 F.2d at 223).

[54] *Id*.

[55] *Id*.

[56] *See* Trial Transcript at 143 (testimony by Furioso that she was "100% [sure] they caught the right guy" and that she was "looking right at him"); *id*. at 184–85 (testimony by Bentley that Peeple's "image is drilled into [her] head for the rest of [her] life probably").

[57] *Id*. at 130–31.

admitting the identification testimony of Furioso and Bentley after denying Peeples' request for a special in-court identification procedure, as there can be no question that, even if we were to find an error in the District Court's evidentiary ruling, that error would have been harmless beyond any reasonable doubt.

We reach this conclusion in light of, among other things, the strength of the Government's case and the overwhelming evidence against Peeples.[58] Indeed, the identification by Furioso and Bentley was a minor part of the Government's case against Peeples, which included an unbroken chain of video surveillance, physical evidence, and other eyewitnesses who also identified Peeples without difficulty. And, finally, there is no evidence of prosecutorial misconduct leading to the admission of the challenged identification testimony.

**B.**

Peeples also argues that the evidence recovered from Room 310 should have been suppressed because allegedly there was a warrantless entry and an exploratory search of the room prior to the execution of the search warrant. This last argument is not supported by the record and warrants little discussion.

On July 12, 2017, the magistrate judge conducted an evidentiary hearing in which the FBI agent who arrested Peeples, Special Agent

---

[58] *See ante* at 12–13 & note 16; *see also United States v. Stewart*, 907 F.3d 677, 689 (2d Cir. 2018) ("We have repeatedly held that the strength of the government's case is the most critical factor in assessing whether error was harmless." (quotation marks omitted)).

Bokal, testified. At no point during the evidentiary hearing did Peeples ask Special Agent Bokal whether someone entered Room 310 prior to the execution of the search warrant. After the suppression hearing, the Government submitted a letter that included a crime scene entry log that identified those police officers were posted outside Room 310 between Peeples' arrest and the execution of the search warrant.

Furthermore, at trial, the hotel manager testified that he opened Room 310's door and left because he had no authority to be there. There is no evidence in the record, however, that someone entered and searched the room prior to the execution of the warrant. To the contrary, Special Agent Bokal testified at trial that, shortly after Peeples' arrest, law enforcement agents secured the room from the outside pending the arrival of a search warrant. That testimony was confirmed by other law enforcement officers, who also testified that no one entered the room before the search warrant was executed.

Peeples bears the burden of establishing that his rights under the Fourth Amendment were violated and that any unlawfully-obtained evidence should have been excluded from trial.[59] Yet, Peeples, who already had been taken away and was not present at the

---

[59] *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."); *see also Simmons*, 390 U.S. at 389 ("[T]o effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, *upon motion and proof*, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." (emphasis added)).

31

time when the hotel manager opened the room, failed to provide any evidence in support of his speculative belief that there was a warrantless entry and search of Room 310. In the absence of supporting evidence or a showing that any factual finding was clearly erroneous, Peeples has failed to support his claim that his Fourth Amendment rights were violated.

We have no trouble concluding that the District Court did not err in denying Peeples' motion to suppress and admitting the physical evidence seized from Room 310.

## CONCLUSION

To summarize, we conclude that:

(1) The appropriate remedy for a violation of Rule 5(c)(2) of the Federal Rules of Criminal Procedure is not dismissal of an indictment, but suppression of any post-arrest evidence illegally obtained as a result of the violation of the rule's requirement.

(2) Peeples failed to show that his transfer to the Western District of New York for an initial appearance in violation of Rule 5(c)(2) caused him any prejudice.

    a. With respect to the trial proceedings, because the Government did not rely on Peeples' post-arrest statements in its case before the jury, there was no evidence that could have been excluded and thus the

motion to dismiss the criminal charges was correctly denied.

b. With respect to the affidavit in support of the application for the search warrant and the affidavit in support of the criminal complaint, Peeples failed to demonstrate that the circumstances presented here warranted the exclusion of the post-arrest statements. And, in any event, even if we were to excise those statements from the affidavits, the District Court correctly denied the motion to dismiss because the search warrant and the criminal complaint remained valid in light of the ample untainted evidence in the affidavits supporting the magistrate judge's probable cause findings.

(3) The District Court did not err in denying Peeples' motion to dismiss the criminal complaint because, even though the magistrate judge failed to sign the *jurat* on the last page of the affidavit in support of the criminal complaint, the magistrate judge signed the *jurat* on the complaint itself, to which the affidavit was attached. The magistrate judge's signature in the complaint attested to the fact that the complainant's assertions were sworn before the magistrate judge and signed in his presence, thereby complying with the requirement of Rule 3 of the Federal Rules of Criminal Procedure.

(4) Peeples failed to present evidence showing that the in-court identification by the Chase bank employees was irreparably tainted by suggestibility in violation of his due process rights. We need not conclude that the District Court erred in admitting the identification testimony while denying Peeples' request for a special in-court identification procedure because any such error would have been harmless beyond a reasonable doubt and thus would not warrant a vacatur of Peeples' conviction.

(5) Peeples failed to support his speculative belief that there was a warrantless entry and exploratory search of Room 310 prior to the execution of the search warrant and thus the District Court did not err in admitting the physical evidence seized from the hotel room pursuant to the search warrant.

For the foregoing reasons, the District Court's August 1, 2018 judgment is **AFFIRMED**.